**STATE TEACHERS RETIREMENT BOARD, et al., Plaintiffs,**

v.

**FLUOR CORPORATION and Manufacturers Hanover Trust Co., Defendants.**

**No. 76 Civ. 2135 (RWS).**

United States District Court, S.D. New York.

June 11, 1984.

Schwartz, Shapiro, Kelm & Warren, Columbus, Ohio, for plaintiffs; Russell A. Kelm, Columbus, Ohio, of counsel.

Cahill, Gordon & Reindel, New York City, for defendant Fluor Corp.; Raymond L. Falls, New York City, of counsel.

Kelley, Drye & Warren, New York City, for defendant Mfrs. Hanover Trust Co.; Richard J. Concannon, Robert E. Crotty, Kevin J. Walsh, Michael M. Horowitz, New York City, of counsel.

## OPINION

SWEET, District Judge.

Defendant Manufacturers Hanover Trust Company ("MHT") has moved under Rule 15(a), Fed.R.Civ.P., to amend its answer to assert a cross-claim for contribution against defendant Fluor Corporation ("Fluor"). MHT has also moved for an order limiting proof regarding MHT's trading in Fluor stock to the period ending March 6, 1975, and for orders excluding certain evidence from trial. Plaintiffs, State Teachers Retirement Board, individually and on behalf of others similarly situated ("State Teachers"), have moved for an order severing Fluor from this action and providing for a post-trial hearing to approve a settlement between State Teachers and Fluor. For the reasons given below, MHT's motion to amend is granted, its motion regarding trading after March 6 is denied and its other motions are denied except as set forth herein. State Teachers' motion is denied.

### Motion to Amend to Add a Cross-Claim

The extensive history of this matter is given in this court's and the Court of Appeals' decisions and need not be repeated here. On May 2, 1984, eight years after this action was commenced and shortly before the trial was to start, Fluor and State Teachers executed a settlement agreement ("Settlement") under which Fluor would pay State Teachers $100,000 in return for dismissal of all claims against it. The Settlement provides that if MHT obtains leave to assert a cross-claim against Fluor, the Settlement becomes void.

Under Rule 15, leave to amend a pleading "shall be freely given when justice requires." The Supreme Court has noted that "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). It should also be noted that Rule 13(g), Fed.R.Civ.P., under which MHT

seeks to assert the cross-claim, is construed liberally so as "to avoid multiple suits and to encourage the determination of the entire controversy among the parties before the court with a minimum procedural steps." 6 C. Wright & A. Miller, *Federal Practice & Procedure* § 1431 at 161 (1971).

■ Leave to amend should not be granted, however, if it is sought for such reasons as "bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of the amendment, etc." *Foman*, 371 U.S. at 182, 83 S.Ct. at 230. In its brief opposing MHT's motion, Fluor has cited cases in which courts denied, on grounds of prejudice, eleventh-hour motions by remaining defendants to assert cross-claims for contribution and indemnity against settling defendants. *See In re Ampicillin Antitrust Litigation*, 82 F.R.D. 647 (D.D.C.1979); *In re Cessna Distributorship Antitrust Litigation*, 532 F.2d 64, 68 (8th Cir.1976); *In re Arthur Andersen & Co.*, 621 F.2d 37, 41 (1st Cir. 1980).

Those cases are not persuasive, however, because special circumstances were present in each of them which are not present in the instant case. In those cases, the courts, in denying the motions, emphasized the time and money that had been expended in attempting to settle the claim, the complexity and difficulty of reaching the settlement, and the likelihood that the assertion of a cross-claim would add issues to the case and further delay the trial. In one of the cases, *Ampicillin Antitrust Litigation*, the court noted that contribution had generally been held to be not available under the antitrust law, and thus the proposed cross-claim was unlikely to succeed on the merits.

■ The settlement here is not particularly complex, nor is there indication that its achievement required extensive time and effort. The parties opposing the motion have not contended that the proposed cross-claim fails to state a claim or is otherwise deficient on the merits. The assertion of the cross-claim will not require postponement of the trial, since Fluor, after extensive discovery and pretrial motions, is fully prepared to litigate this action, and the cross-claim will not introduce new, unanticipated issues. Assertion of the cross-claim will not unduly prejudice Fluor or the plaintiffs. The cross-claim will require no additional discovery and will involve the same facts, events, evidence and witnesses as the main claim. Its assertion here will make it unnecessary for MHT to assert duplicative claims in a separate action. *See Lyons v. Marrud, Inc.*, 46 F.R.D. 451 (S.D.N.Y. 1968). In such a separate action, Fluor might defend with witnesses that might have been unavailable to MHT in the first trial, increasing the possibility of inconsistent verdicts. For these reasons, MHT's motion to amend is granted.

Once the cross-claim has been permitted, the Settlement becomes void. Thus, the reasons for State Teachers' motion regarding severance and the settlement hearing are no longer present, and that motion is denied.

**Motion Regarding Trading After March 6, 1975**

State Teachers represents a class of persons who sold Fluor stock during the period March 3 through March 6, 1975, purportedly without knowledge of certain material, nonpublic information communicated to MHT. During this period, plaintiffs sold 688,000 shares of Fluor stock at approximately $22 per share. Plaintiffs contend that expert testimony they will adduce at trial will show that the fair value of Fluor stock during this period, assuming simultaneous disclosure of all inside information, would have been approximately $34 per share. Accordingly, plaintiffs calculate their per share loss at $12, and contend that their damages are $8,256,000 ($12 × 688,000).

MHT purchased 208,600 Fluor shares during March 4 through 6, 1975. (MHT did not purchase Fluor shares on March 3, 1975.) Plaintiffs, assuming an average per

share purchase price of $22 and a fair value of $34, contend that MHT's profits from this trading were $2,503,200 ($12 × 208,600) (the "March 3–6 Profits"). MHT purchased 231,350 shares during March 10 through April 11. Assuming an average per share purchase price of $25.69 for these shares, plaintiffs contend that MHT's profits for this trading were $1,922,519 ($8.31 × 231,350). MHT purchased no more Fluor shares after this period until June 9, but the purchases after that date were at per share prices exceeding $34, and plaintiffs concede that MHT earned no insider's profits on these purchases. Accordingly, plaintiffs contend that MHT's gains for the entire period of insider trading were $4,425,719 ($1,922,519 + $2,503,200) (the "March 3–April 11 Profits").

MHT contends that plaintiffs can be awarded damages of no more than the March 3–March 6 Profits because of the decisions of the Court of Appeals for this Circuit in *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 172–73 (2d Cir.1980) and *Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 91, 94–95 (2d Cir.1981). Plaintiffs contend that *Elkind* would limit their damages only to the March 3–April 11 Profits.

In *Elkind*, the Court of Appeals established a new limit on recoveries in 10b–5 actions, the "disgorgement measure," which equals "the amount gained by the tippee as a result of his selling at the earlier date rather than delaying his sale until the parties could trade on an equal informational basis." *Elkind*, 635 F.2d at 172. This court has already held that the disgorgement measure applies to this action. *State Teachers Retirement Board v. Fluor*, 566 F.Supp. 945, 953–54 (S.D.N.Y. 1983). The parties agree that the disgorgement measure would limit plaintiffs' damage award to, at the most, the March 3–April 11 Profits, since these profits represent the total gain MHT may have realized from trading on its alleged inside information.

MHT, however, seeks to take *Elkind* one step further, by reading it in conjunction with *Wilson*. In *Wilson*, the Court of Appeals limited the class of 10b–5 plaintiffs to those who trade "contemporaneously with the insider." 648 F.2d at 94. MHT would have this court create a disgorgement cap for this class of plaintiffs equal to the profits MHT gained from those of its purchases that were contemporaneous with the plaintiffs' sales—*i.e.*, the March 3–6 Profits.

This holding would not comport with the rationale of *Elkind*. MHT's position mixes *Wilson's* holding concerning the appropriate class of plaintiffs with *Elkind's* limitation on the damages that may be assessed against a defendant. *Elkind's* stated rationales for the relevant portion of its holding were that (1) "To the extent that it makes the tipper and tippees liable up to the amount gained by their misconduct, it should deter tipping of inside information and tippee-trading" and (2) "On the other hand, by limiting the total recovery to the tippee's gain, the measure bars windfall recoveries of exorbitant amounts bearing no relation to the seriousness of the misconduct." 635 F.2d at 172. Both of these rationales would be served by using March 3–April 11 Profits as the disgorgement measure. Fluor and MHT, the alleged tipper and tippee, would be liable for the amount gained by their misconduct, and thus similar tipping will be deterred. On the other hand, plaintiffs would not be able to recover a windfall amount unrelated to the seriousness of their misconduct, since their recovery would be limited to the March 3–April 11 Profits, and would still be below plaintiffs' actual damages.

Indeed, were the court to adopt the March 3–6 Profits as the disgorgement measure, defendants would enjoy a windfall gain. Their potential damages would be limited not merely to their total insider profits, but to that portion of their profits earned while plaintiffs were trading. Such a holding would not serve the purposes of *Elkind*. See Wang, *Trading on Material Nonpublic Information on Impersonal Stock Markets: Who is Harmed, and Who Can Sue Whom Under SEC Rule 10b–5?*,

54 S.Cal.L.Rev. 1217, 1274–79 (1981). On the other hand, adoption of the March 3–April 11 Profits as the disgorgement measure would not violate *Wilson's* causation requirement, since under either disgorgement measure, plaintiffs' recovery would not exceed the damages they suffered from their trading during the March 3–6 period.

The strongest argument MHT has put forward for adoption of the March 3–6 Profits as the disgorgement measure is that if plaintiffs were permitted to recover the March 3–April 11 Profits and there were presently pending a suit by a class of persons who had traded after March 6, both classes might recover the same profits, violating the second purpose of the *Elkind* cap, described above. The *Elkind* Court recognized this problem when it noted that "In some instances the total claims could exceed the wrongdoer's gain, limiting each claimant to a pro rata share of the gain." 635 F.2d at 173. The *Elkind* Court did not discuss the problems that may arise with the pro rata solution—*e.g.*, inconsistent judgments that might result if the two classes of plaintiffs were to sue in different courts. *See* Note, *Damages to Uninformed Traders for Insider Trading on Impersonal Exchanges*, 74 Colum.L.Rev. 299, 313–15 & n. 130 (1974). However, the court need not confront this problem, since a suit by another class seeking damages for the insider trading alleged here would be barred by the statute of limitations. *See Arneil v. Ramsey*, 550 F.2d 774, 779 (2d Cir.1977). *Elkind* seeks to prevent unjust enrichment. If the defendants here have been unjustly enriched, the instant plaintiffs are now the only ones entitled to take those unfair profits away, and they must be permitted to do so. *See* Langevoort, *Insider Trading and the Fiduciary Principle: A Post*-Chiarella *Restatement*, 70 Cal.L.Rev. 1, 39 (1982).

For these reasons, MHT's motion is denied. State Teachers will be permitted to present evidence of all of MHT's purchases of Fluor stock that took place during the period when MHT had inside information. This evidence will be relevant to the jury's determination of the materiality and scienter issues. The purchases will also be used to compute the March 3–April 11 disgorgement measure. Assuming that there is no dispute as to the volume, timing and price of MHT's and plaintiffs' purchases, the jury will be asked to determine the value of the tipped information. This would be done by a special verdict which would present a list of all alleged tips and ask the jury, as to each alleged tip (1) whether that item constituted a 10b–5 violation, (2) if so, whether that item became either nonmaterial or public before April 11, (3) if so, on what date, and (4) if the tip constituted a 10b–5 violation, what was its value, *i.e.*, how much would its disclosure have increased the stock price. The parties are invited to make any additional submissions on this question, including proposed special verdict forms.

**Typewritten Version of Winterfeldt Notes**

 Defendants have moved to exclude from the evidence offered at trial State Teachers' typewritten version of the handwritten notes taken by Lester Winterfeldt ("Winterfeldt") at the February 24, 1975 meeting at Fluor's California headquarters. Defendants contend that introduction into evidence of the typewritten notes would prejudice and mislead the jury, especially with respect to whether the parties had the requisite scienter to violate the securities laws, whether any tipping was done as part of a scheme to disclose information for profits or whether the information slipped out inadvertently, and whether MHT knowingly received and used inside information. State Teachers contends that the typewritten version would aid the jury in understanding Winterfeldt's notes.

The parties have been unable to discover a case that has considered a similar question. State Teachers has noted that in *United States v. Carson*, 464 F.2d 424, 436–37 (2d Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 268, 34 L.Ed.2d 219 (1972), the Court of Appeals sanctioned the admission of transcripts of tape recordings, with two versions of the transcripts being submitted

if the two sides differed as to the contents of the tape.

Although the typewritten version may make the February 25 meeting appear to have been a more formal presentation than the handwritten version suggests, the handwritten notes are difficult to read, and the typewritten notes can serve a function similar to tape transcripts—that of making it easier for the jury to read and understand the notes rapidly. Accordingly, State Teachers will be permitted to use the typewritten version as an aid for the jury. However, only the original notes will be admitted into evidence. If defendants disagree as to any of State Teachers' interpretations, they may present their own typewritten version of part or all of the notes. The jury will be instructed that the typewritten versions are only the parties' interpretation of the notes and that they should be used only as an aid in reading the actual evidence—the handwritten notes. The jury will not be permitted to use the typewritten versions during their deliberations since, unlike tape recordings, the handwritten notes may be reviewed at will in the jury room and since during the deliberations the chance of prejudice outweighs the value of the typewritten version as an interpretive aid.

### Expert Witness

MHT has moved for an order precluding Herschel C. Pittenger ("Pittenger") from testifying as both an expert witness and a lay witness. In 1975, Pittenger was assistant executive director of investments at State Teachers. Before holding this position, Pittenger was a senior securities analyst at Nationwide Insurance Co. In May 1976, Pittenger became first vice president for investments at Wheeling Dollar Savings and Trust Co. He is now investment officer for the State of New Mexico. The pretrial order states that State Teachers will call Pittenger to testify as an expert witness on the operation of the stock market, the factors that are relevant in the pricing of securities, institutional investor interest in Fluor stock and the materiality of the information tipped to MHT. As a

lay witness, Pittenger would testify on why State Teachers decided to sell its Fluor stock in January 1975. The latter testimony may be relevant to the issues of reliance and causation and to Fluor's and MHT's defenses of State Teachers' lack of due diligence.

MHT contends that allowing Pittenger to testify as an expert would bolster his fact testimony and confuse the jury. State Teachers contends that Pittenger is qualified as an expert and his testimony would not have these effects.

 A trial judge has broad discretion in the matter of the admission or exclusion of expert evidence. *United States v. Carson*, 702 F.2d 351, 369 (2d Cir.), *cert. denied*, — U.S. —, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983). Expert testimony is admissible under Fed.R.Evid. 702 if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Although Pittenger is qualified to testify as an expert on the planned topics, there are many other experts who are equally qualified. At his deposition, Pittenger stated that he did not remember what he, as State Teachers' assistant executive director of investments, knew of the "laundry list" items in 1975. At trial, defendants will contend that State Teachers gave slight consideration to the laundry list items when deciding to sell, and will attempt to use testimony of the sort Pittenger gave at his deposition to show this. If Pittenger testifies as an expert, there is some likelihood the jury would be confused between his testimony (as a lay witness) about what State Teachers did in 1975 and his testimony (as an expert witness) as to what facts State Teachers might have considered important had it known of them. However, this danger can be offset by separating the two portions of his testimony and by an instruction from this court. Accordingly, MHT's motion is denied.

### Evidence on Tappan's and Robert Fluor's Stock Ownership

 Fluor has moved to prevent the admission of evidence of Fluor stock own-

ership by J. Robert Fluor and David S. Tappan ("Tappan"). Such evidence would be relevant only to the question of personal benefit to these two individuals under *Dirks v. SEC*, —— U.S. ——, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983).

State Teachers has not alleged that J. Robert Fluor was a tipper. Evidence of his stock ownership is thus irrelevant to the *Dirks* issue, and will not be admitted at trial.

In the December 12, 1983 opinion, this court stated:

> Although Fluor urges that there remains no issue as to the existence of a tip by Tappan by virtue of the ruling with respect to Paragraph 33(c) of the answer to interrogatories directed to the laundry list, the deposition testimony of Winterfeldt fails to distinguish whether Tappan disclosed the backlog and earnings other than those described in item 3(a). The issue of Tappan's breach of fiduciary duty thus remains in the case.

576 F.Supp. 1116 at n. 3. A tipper who owns stock stands to benefit by tipping information that tends to raise the stock's price. Accordingly, evidence of Tappan's stock ownership will be admitted.

## MHT's Other Contacts with Fluor and SASOL

Defendants have also moved to exclude evidence relating to the following:

> (1) The February 26, 1975 meeting between John H. Lyon ("Lyon"), a managing director of Manufacturers Hanover Export Finance, Ltd. and C.A.P. Becker, SASOL group treasurer;
>
> (2) The February 25, 1975 meeting between E. Danson Perin ("Perin") and Bruce Henderson ("Henderson") of MHT and Fluor financial officers; and
>
> (3) MHT's renewal of a $1,000,000 line of credit to Fluor on March 1, 1975.

Defendants contend that the court has already held that these items do not give rise to 10b-5 violations and that the reasons for that holding have not changed. State Teachers contends that the admission of evidence on these items could lead to inferences that MHT received inside information at these meetings.

In the opinion of March 28, 1980, this court stated in regard to these three items:

> It is not clear from plaintiff's complaint and 9(g) statement whether it is also alleging that Lyon, Perin and Henderson gleaned material inside information from their "contacts" with Fluor and SASOL. If so, its failure to allege with particularity what non-public information was conveyed to Manufacturers and not disclosed by it violates Fed.R.Civ.P. 9(b), and justifies the dismissal of any such claim. *See* section 11(B), *supra*.[19] In any event, plaintiff has offered no evidence that any of these Manufacturers representatives learned who was awarded the SASOL II project through these "contacts." The affidavits and exhibits it offers reveal that Henderson's report of his meeting with Fluor relate to a discussion of Fluor's financing of a project in Mexico (Pl.Ex. 21). Lyon's memorandum describing the February 26 discussion with SASOL about its new project reflects that the identity of the contractor was not yet known (Pl.Ex. 1). The letter confirming the loan made to Fluor indicates that it was of a general nature to support Fluor's issuance of commercial paper. (Pl.Ex. 22). In addition, there is no evidence that any of these Manufacturers representatives had any contact with Manufacturers investment officers during this period.

-----

[19] Moreover, to the extent that plaintiff was attempting to allege a tipping claim against Fluor for these additional contacts, the complaint is inadequate because Count IV specifically limits the tipping claim to disclosures made on February 24, 1975.

500 F.Supp. 278 at 300 (S.D.N.Y.1980).

In its May 26, 1981 opinion, the Court of Appeals did not list this holding as among the issues on appeal, 654 F.2d 843 at 849–50 (2d Cir.1981), and in its discussion of the claim that MHT traded with inside information, it did not reverse or even discuss this part of this court's opinion. *Id.* at 854–55.

■ As to the February 26 meeting between Lyon and C.A.P. Becker, State Teachers has pointed to no facts that have changed or have been discovered since this court's previous holding. Even though discovery is now complete, State Teachers still has not alleged in its fifth amended complaint or elsewhere that any material inside information was disclosed at this meeting—the only meeting at which such disclosures are alleged is the February 24, 1975 Winterfeldt meeting. Nor has State Teachers alleged that the information obtained in this meeting, though public, was combined with Winterfeldt's nonpublic information in making the purchase decision. State Teachers argues that the note in the report describing the February 26 meeting to the effect that the "name [of the contractor awarded the SASOL II contract] has not yet been announced" could lead a jury to infer that the name had not been *publicly* announced, but that SASOL disclosed it to Lyon at the February 26 meeting. However, there is no fact affirmatively supporting this inference, and State Teachers thus has not created a fact question on this issue sufficient to go to the jury. More importantly, the testimony of all witnesses involved indicates no contacts between Lyon and the persons in the MHT trust department who made the purchase decision. State Teachers' unsupported contention that a jury could infer that MHT decided to buy because of inside information derived from this meeting and its argument that the knowledge of a corporate agent is legally imputed to the corporation do not contradict the witnesses' testimony of no contacts. Accordingly, evidence regarding the February 26 meeting between Lyon and C.A.P. Becker will not be permitted.

■ However, as to the February 25 meeting between Perin, Henderson and Fluor, although there is no allegation that material inside information was tipped at it, the meeting itself tends to demonstrate the existence of a banking relationship, and that relationship provides a possible incentive for Fluor to have tipped information to MHT. The renewal of the credit line, although its significance seems minor, is also evidence of the banking relationship and the possible incentive. Accordingly, evidence relating to these two items will be admitted.

### SASOL Publicity Embargo

■ State Teachers seeks to introduce evidence of Fluor's embargo on publicity relating to the awarding of the SASOL II contract. State Teachers contends that this evidence is relevant in proving that Fluor's bidding for and subsequent signing of the SASOL II contract was not publicly known. This court has already held that Fluor did not have a duty to disclose the contract award during the week of March 3. 500 F.Supp. at 294. The Court of Appeals affirmed this holding. 654 F.2d at 850–51.

State Teachers has not alleged that the award of the SASOL II contract was tipped to MHT, nor could it do so, since the contract was awarded four days after Winterfeldt's February 24 meeting. The publicity embargo on the awarding of the contract does not tend to prove that Fluor's submission of a bid on the contract was not publicly known. It may, however, be relevant as to the materiality of the information tipped, and accordingly, evidence relating to the publicity embargo on the award of the contract will be admitted.

MHT's motion to asset a cross-claim is granted. Defendants' motion to preclude evidence relating to MHT's trades after March 6 is denied, and such evidence will be admitted for the jury's determination of liability and the court's determination of the *Elkind* cap. The typewritten version of the Winterfeldt notes will be allowed as set forth above. Pittenger may testify as both an expert witness and a lay witness. Evidence of J. Robert Fluor's stock ownership will not be admitted, but evidence of Tappan's will. Evidence of the February 26 meeting involving Lyon and C.A.P. Becker will not be admitted. Evidence of the February 25 meeting, the credit line and the publicity embargo will be admitted.

Trial of this matter will begin on June 18, and a final pretrial conference will be held at 9:30 on June 15, 1984.

**IT IS SO ORDERED.**