SECURITIES AND EXCHANGE
COMMISSION, Plaintiff

v.

LIFE PARTNERS HOLDINGS, INC.,
Brian Pardo, R. Scott Peden, and
David M. Martin, Defendants.

Civil Action No. 1–12–CV–00033–JRN.

United States District Court,
W.D. Texas,
Austin Division.

Signed Nov. 19, 2013.

Order Denying Reconsideration
Dec. 3, 2013.

B. David Fraser, Jessica Bogan Magee, Matthew J. Gulde, U.S. Securities and Exchange Commission, Fort Worth, TX, for Plaintiff.

Elizabeth L. Yingling, Laura J. O'Rourke, Meghan Elizabeth Hausler, Will R. Daugherty, Baker & McKenzie LLP, Jay Ethington, Law Office of Jay Ethington, Robert Allen Hawkins, S. Cass Weiland, Squire Patton Boggs (US) LLP, Dallas, TX, J. Pete Laney, The Law Offices of J. Pete Laney, Austin, TX, for Defendants.

## ORDER

JAMES R. NOWLIN, District Judge.

Before the Court is Defendants Life Partners Holdings, Inc. ("Life Partners" or "LPHI") and R. Scott Peden's (collectively "Defendants") Motion for Summary Judgment. (Dkt. No. 110). For reasons set out below, the Court denies Defendants' Motion.

## I. BACKGROUND

Defendants move for Partial Summary Judgment on the SEC's claims against them related to their alleged failure to disclose systematic and material understatement of life expectancies ("LEs") they utilized in the sale of life insurance policies in the secondary market ("life settlements"). Defendants raise a variety of arguments in support of their motion. Specifically, Defendants argue that (1) the court lacks jurisdiction to hear this case because the business practices of LPI are not a proper subject for this case; (2) events occurring before or after the period of January 2007 to November 30, 2011 (which Defendants refer to as the "relevant period") are not germane to Plaintiff's allegations; (3) the evidence conclusively establishes that LEs do not in any way

impact Life Partners' pricing or revenue; (4) the evidence conclusively demonstrates that Life Partners did not underestimate its LEs during the relevant period, and even if they did, they could not have known that they were doing so; (5) the evidence conclusively establishes that Peden's massive June sale of 19% of his Life Partners' stock was not based on inside information; and (finally) (6) the evidence conclusively demonstrates that LPHI's assets were properly impaired.

## II. STANDARD OF REVIEW

The court must grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Washburn v. Harvey,* 504 F.3d 505, 508 (5th Cir.2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Washburn,* 504 F.3d at 508.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary-judgment evidence of the existence of a genuine fact issue. *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Mere conclusory allegations are not competent summary-judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.,* 476 F.3d

337, 343 (5th Cir.2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary-judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.,* 465 F.3d 156, 164 (5th Cir.2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

## III. ANALYSIS

### A. The Court Has Subject Matter Jurisdiction.

Defendants argue that the Court lacks jurisdiction to hear this case because (1) LPI is not a named Defendant and (2) the life settlements at issue in this case are not "securities" under federal securities law. (Dkt. No. 110 at 9). For reasons set out in detail below, the Court rejects Defendants arguments

### (i) LPI's business *is* LPHI's business, as well as the source of its revenues.

In their motion, Defendants argue that LPI and LPHI are distinguishable

entities and that, therefore, the Court should dismiss all of the claims that are based in part on LPI's business since LPI is not a named Defendant in this case. The Court disagrees. The record is literally stocked with evidence demonstrating that there is no meaningful difference between LPI and LPHI. For instance, LPI and LPHI share physical offices and have a consolidated Board of Directors. (Dkt. No. 135–4 at 7). Along the same lines, the two companies file consolidated financial statements and LPHI reports on LPI's litigation in its annual reports. (*Id.* at 10). *Miller v. MSX–IBS Holding, Inc.,* No. 09–cv–15046, 2012 WL 458486, at *7 (E.D.Mich. Feb. 13, 2012) (holding that consolidated financials are usually necessary for a fair presentation when one of the entities in the consolidated group directly or indirectly has a controlling financial interest in the other entities). Indeed, even LPHI's employees and managers do not appear to distinguish between the two entities: Defendant Peden testified that "LPI is an operating subsidiary" and that "LPHI is a holding company, so it has no employees or operations." (*Id.* at 7). Additionally, in its public filings, LPHI repeatedly refers to itself and LPI interchangeably: "*[w]e* are a specialty financial services company, providing purchasing services for life settlements to *our* client base...*[w]e* facilitate these transactions by identifying, examining, and purchasing the policies as agent for the purchasers." (LPHI 2010 Form 10K at 3).

Given that LPHI has no income except that which comes from LPI's business operations, the Court is at a loss to find a single meaningful difference between LPHI's business and LPI's business. (Peden 7/23/13 Dep., 35:24–36:3). Consequently, the Court holds that while LPI may not be a named defendant in this action, its business conduct is germane to the issues in this case. *See, e.g., In re Global Crossing, Ltd., Sec. Litig.,* No. 02–Civ–910, 2005 WL 1875445, at *4, 2005 U.S. Dist. Lexis 16232, at *11 (S.D.N.Y. Aug. 5, 2005) (noting that courts have sustained securities claims against parent corporations for the acts of a subsidiary where the parent exerted control over the subsidiary through common ownership and common officers and directors).

**(ii) Viatical Settlements are securities, and even if they are not, there is more than enough evidence to support Plaintiff's claim that Defendants made misleading statements to shareholders and the public that were material.**

■ Defendants next argue that life settlements are not securities under federal securities laws. In support of this position, Defendants cite a single case from the D.C. Circuit. (Dkt. No. 110 at 9). Although the 5th Circuit has not yet directly addressed the question of whether viatical settlements are securities as defined by federal law, the holdings of the Court of Appeals for the D.C. Circuit are not binding upon this Court. Additionally, the thrust of persuasive authority cuts against following the D.C. Circuit's 1996 opinion in *SEC v. Life Partners,* 87 F.3d 536, 547 (D.C.Cir.1996).

The Securities Act of 1933 and the Securities Exchange Act of 1934 both define the term "security" as including the catch-all term "investment contracts." 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10). The phrase "investment contract" is not defined in either statute.

■ The Supreme Court has adopted a flexible test for determining whether a particular transaction qualifies as an investment contract. *See SEC v. W.J. Howey Company,* 328 U.S. 293, 299, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) ("statutory policy of

affording broad protection to investors is not to be thwarted by unrealistic and irrelevant formulae"); *see also Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967) (observing that "remedial legislation should be construed broadly to effectuate its purposes"), *Pinter v. Dahl*, 486 U.S. 622, 652, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). Specifically, the Court has held that "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits *solely from the efforts of the promoter or a third party . . . .*" 328 U.S. at 298–99, 66 S.Ct. at 1103 (emphasis added). The Court has subsequently re-iterated that "Congress" purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called. *S.E.C. v. Edwards*, 540 U.S. 389, 393, 124 S.Ct. 892, 896, 157 L.Ed.2d 813 (2004) (quoting *Reves v. Ernst & Young*, 494 U.S. 56, 61, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990)). "To that end, [Congress] enacted a broad definition of 'security,' sufficient 'to encompass virtually any instrument that might be sold as an investment.'" *Id.* In sum, "through *Howey* and its progeny, the Supreme Court has consistently repeated the interpretive principle that courts should determine the contours of the term 'security' from the posture that substance should be elevated over form, with a special sensitivity to the economic reality of the transaction, not its formal characteristics." *S.E.C. v. Mut. Benefits Corp.*, 323 F.Supp.2d 1337, 1339–40 (S.D.Fla.2004) *aff'd*, 408 F.3d 737 (11th Cir.2005). *See also Tcherepnin*, 389 U.S. at 336, 88 S.Ct. 548.

The cynosure of the Court's analysis of this issue is whether the investor's expectations of profits in the products sold by LPHI/LPI is based "solely on the efforts of the promoter or a third party." In *SEC v. Life Partners*, the D.C. Circuit adopted a rigid, forward looking approach to deciding whether a product is a security under federal securities laws. *SEC v. Life Partners*, 87 F.3d 536 (D.C.Cir.1996). As the case name indicates, the DC Circuit was presented with virtually identical facts as those before this case. *Id.* The DC Circuit concluded that there was "no 'venture' associated with the ownership of an insurance contract from which one's profit depends entirely upon the mortality of the insured." *Id.* Accordingly, the court held that LPHI's products were not in fact securities under federal law. *Id.*

While Defendants only cite to the D.C. Circuit's opinion in *Life Partners*, Defendants did not manage to cozen the Court into thinking that *Life Partners* is the only case on point. Indeed, since the D.C. Circuit handed down *Life Partners*, several other federal courts have subsequently examined the same question and declined to adopt the D.C. Circuit's position. *See S.E.C. v. Mut. Benefits Corp.*, 408 F.3d 737, 743 (11th Cir.2005); *Wuliger v. Christie*, 310 F.Supp.2d 897 (N.D.Ohio 2004). In *S.E.C. v. Mut. Benefits Corp.*, the 11th Circuit affirmed the District Court's holding that life settlement contracts are in fact covered by federal securities law. 408 F.3d 737, 743 (11th Cir. 2005). The 11th Circuit panel took the position that "[s]ignificant pre-purchase managerial activities undertaken to insure the success of the investment may also satisfy *Howey*" since "investment schemes may often involve a combination of both pre-and post-purchase managerial activities, both of which should be taken into consideration in determining whether *Howey*'s test is satisfied." *S.E.C. v. Mut. Benefits Corp.*, 408 F.3d 737, 743–44 (11th Cir.2005). In *Mutual Benefits*, the Court observed that the investors relied on the Defendant to "identify terminally ill insureds, negotiate purchase prices, pay

premiums, and perform life expectancy evaluations critical to the success of the venture." *Id.* For those reasons, the Court concluded that "the flexible test we are instructed to apply by *Howey* and *Edwards* covers these activities, qualifying MBC's viatical settlement contracts as 'investment contracts' under the Securities Acts of 1933 and 1934." *Id.*

While Defendants in this case urge the Court to adopt the D.C. Circuit's bright line rule for defining securities, the Court is not persuaded by the logic at the heart of the Circuit's *Life Partners* opinion. As Judge Wald, the lone dissenter on the original *Life Partners* panel, pointed out, the problem with the D.C. Circuit's approach (and with Defendants' argument) is that "it elevates a formal element, timing, over the economic reality of the investors' dependence on the promoter . . . and undercuts the flexibility and ability to adapt to 'the countless and variable schemes' that are the hallmarks of the *Howey* test." *Id.* at 550. Instead, Judge Wald proposed that the distinction between the types of investments that satisfy the *Howey* third prong and those which do not ought to turn on "the kind and degree of dependence between the investors' profits and the promoters' activities." *Id.* at 550–51. More precisely, Judge Wald argued that "the third prong of the *Howey* test can be met by pre-purchase managerial activities of a promoter when it is the success of these activities, either entirely or predominantly, that determines whether profits are eventually realized" so long as the pre-purchase activities are directed "at the sale of the investment opportunity." *Id.* at 551–52.

Here, the record shows the LPHI's predictions as to various insured's life expectancies are directly correlated with how much a given viatical life insurance contract will cost the investor up front. Additionally, potential purchasers are wholly reliant upon the accuracy of LPHI's predictions when deciding whether to invest. Where, as here, the allegation exists that LPHI systematically and knowingly provided investors with faulty information, the Court is of the opinion that this is precisely the type of conduct that the securities laws were designed to combat. As such, the Court declines to adopt the D.C. Circuit's holding in *SEC v. Life Partners* and rejects Defendants' arguments that federal securities laws do not apply to viatical life settlement contracts. Instead, since the pre-purchase activities—in this case the creation and use of the LEs—are directed "at the sale of an investment opportunity," the Court holds that the third prong of the *Howey* test is satisfied and the Court has jurisdiction to hear this case.

■ Even assuming arguendo that Defendants reliance on the D.C. Circuit's holding in *SEC v. Life Partners* was appropriate, the Court would still have jurisdiction to hear this case since Defendants' alleged conduct would still fall squarely within the realm of federal securities laws. As Plaintiff correctly points out, LPHI issues and sells securities tied solely to the success or failure of LPI's life settlement business. This being the case, to prevail, the SEC only needs to show that Defendants' misleading statements to shareholders and the public, regarding its business, revenues, net income, and accounting practices were material. That is precisely what the SEC alleges, and the record is full of evidence sufficient to raise genuine issues of material fact as to each of its allegations. (*See, e.g.,* Ex. B, p. 10–11, App. 13–14).

**B. Sufficient evidence exists in support of all of Plaintiff's allegations to survive summary judgment**

In addition to their jurisdictional arguments, Defendants contend that the Court

should dismiss Plaintiff's § 10(b) allegations relating to (1) the 1999 hiring of Cassidy; (2) the Colorado Securities Commission lawsuit relating to LPI's facilitation of viatical settlements; (3) Peden's statements relating to Cassidy's methodology; (4) Cassidy's methodology and historical results of his LE's; and (5) the ROI achieved by purchasers of life settlements. The Court disagrees. The fact that Peden's statements regarding Cassidy's methodology were not made to LPHI shareholders would only be grounds for dismissal if the SEC built its case around that particular statement. It plainly does not. Instead, the SEC cites Peden's internal statements to highlight what they allege to be the falsity of other statements that *were* made to the public and LPHI shareholders. The same is true of each of Defendants' aforementioned complaints: the SEC does not base its 10(b) allegations solely on these events, but rather wishes to use each of these events to demonstrate that Defendants possessed knowledge that call Defendants' proffered explanations of their behavior during the relevant period into question.

(i) **The SEC's allegations related to Defendants' use of Life Estimates do not have to be dismissed as a matter of law**

Defendants argue that since the SEC's claims are based on events occurring between January 2007 and November 30, 2011, evidence outside that "Relevant Period" is not germane to the case and, specifically, to the Court's determination of their motion for summary judgment. (*See, e.g.,* Mot. at pp. 1, 7–8). The Court disagrees.

As Plaintiff correctly points out, a defendant's statements and conduct both preceding and following the period in which he is charged have repeatedly been found relevant to the issues of scienter,

intent, and knowledge. *See In re Seagate Tech. II Sec. Litig.,* No. C–89–2493(A), 1993 WL 293008, at *1–2, 1993 U.S. Dist. LEXIS 18065, at *3–4 (N.D.Cal. June 10, 1993); *In re Control Data Corp. Sec. Litig.,* 1988 WL 92085, at *3, 1987 U.S. Dist. LEXIS 16829, at *7–8 (D.Minn. Dec. 10, 1987); *Michaels v. Michaels,* 767 F.2d 1185, 1195 (7th Cir.1985); *SEC v. Holschuh,* 694 F.2d 130, 143–44 (7th Cir.1982); *Austin v. Loftsgaarden,* 675 F.2d 168, 180 (8th Cir.1982), *rev'd and remanded on other grounds,* 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986); *State Teachers Retirement Bd. v. Fluor Corp.,* 589 F.Supp. 1268 (S.D.N.Y.1984); *Clairdale Enters. v. C.I. Realty Investors,* 423 F.Supp. 257 (S.D.N.Y.1976); *United States v. Riedel,* 126 F.2d 81, 83 (7th Cir.1942). Defendants nevertheless argue that the SEC's evidence of conduct which occurred outside of the 2007–2012 time frame is stale as a matter of law. In support of this assertion Defendants offer *In re Kidder Peabody Secs. Litig.,* 94 Civ–3954, 1995 WL 590624, at *5, 1995 U.S. Dist. Lexis 14481 at *14 (S.D.N.Y.1995). Defendants' reliance on *Kidder* is misleading and misplaced. To begin with, Defendants' quote the *Kidder* Court as saying that "stale information is not material as a matter of law." *Id.* As Defendants use it in their brief, this quote from *Kidder* reads like it came out of a fortune cookie. When viewed in context, however, it becomes clear that the *Kidder* Court actually made that statement in the context of analyzing whether or not statements which preceded a Defendants' alleged conduct were material to *a shareholder's decision to invest. Id.* Furthermore, the *Kidder* Court actually found that the preceding statements *were* material. *Id.* Thus even if *Kidder* were on point, it would still cut against Defendants' arguments. Here, all of the evidence of conduct and statements which occurred outside of the "relevant time pe-

riod" is offered by the SEC as evidence of Defendants' culpable mental state when they made the decisions that are the subject of this lawsuit. Accordingly, the Court finds the evidence relevant, fresh, and more than sufficient to raise a genuine issue of material fact as to whether Defendants' acted unlawfully.

### (ii) The Life Estimates were sold in connection with a security

■ In arguing that their LEs were not made "in connection with" the purchase or sale of a security, Movants claim: (1) that their LEs "were utilized by LPI in the facilitation of viatical and life settlements [sales] in order to provide a time period during which premium payments would escrowed," and (2) that "LPI's revenues were not dependent upon the Cassidy LE or how long an insured ultimately lived." (Dkt. No. 110 at 5–6). The Court finds Defendants' suggestion that there is insufficient evidence to raise a genuine issue of material fact as to either of these questions risible. In its reply to Defendants motion, the SEC points the Court to more than enough meaningful evidence on both questions to survive summary judgment. For instance, in its own 10–K and 10–KSB forms, LPHI disclosed to its shareholders, (under the heading "Our Purchasers Depend on Our Abilities to Predict Life Expectancies") that "[a] purchaser's investment return from a viatical or life settlement depends primarily on the demise of the insured ... we price settlements based on the anticipated life expectancy of an insured." (LPHI 2005 Form 10–KSB, p. 12, Ex. D, App. 34 (emphasis added); see also, e.g., Ex. B, p. 10, App. 13). Along the same lines, Life Partners' Vice President of Policy Administration admitted that LEs are necessary for pricing life settlements and that LEs help Life Partners calculate the acquisition cost based on the target return on investment ("ROI") for a specific LE.

(Kurt Carr 12/13/11 Turnbow Dep., pp. 23–25).

While Defendants cite Peden's testimony as an absolute, unimpeachable version of what happened in this case, the SEC cites equally persuasive evidence that calls much of Peden's version of events into question. For instance, Peden told Life Partners' licensees—including some LPHI shareholders—and investors in 2010 that "[t]he acquisition cost will target a compounded return will be [sic] between 12–14% for the life expectancy estimate." (May 3, 2010 Peden letter, ¶ 2). Additionally, while Peden's current story is that LEs are unrelated to acquisition cost and revenues, Peden's opinion appears to have been different in the very recent past. (Id.). These statements and tidbits are more than sufficient to permit this case to go to a jury.

### (iii) Evidence exists to support Plaintiff's argument that the life estimates impacted Life Partners' revenue.

■ The Court likewise is unimpressed with Defendants' argument that there is no evidence to support the SEC's assertion that the LEs impacted LPHI's revenue. Peden's own words condemn this argument to failure. As Peden admitted, LE affects acquisition costs ... and LPHI's compensation is based on whatever is left over after the acquisition costs is "what we (LPHI) would be able to keep." If these admissions were not enough to raise a genuine issue of material fact as to the SEC's claims, and they surely are, Peden actually goes on: "the better deal we are able to acquire a policy at, the more spread there would be for us. If we have to pay more for the policy or not able to acquire the policy at an as attractive a price, our amount we would make would be compressed." (Peden Dep., 4/15/11, at

pp. 112–113). These statements suffice to defeat Defendants' pleas for summary judgment on this issue.

Defendants additionally argue that the Court should grant summary judgment because the evidence shows conclusively that the LEs were not underestimated during the relevant period AND that Defendants "could not possibly have known whether the Cassidy LEs were underestimated." Neither assertion withstands scrutiny. Plaintiff's expert witness Larry Rubin's analysis directly contradicts both of Defendants assertions and suggests that the LEs were in fact short and raises a question as to whether Defendants knew this was the case. (*See* Dkt. No. 106–1). This fact alone raises a genuine issue of material fact. Additionally, the fact that Mark Embry provided Defendant Peden an analysis of maturities and "ROI numbers" which showed that of 1,993 policies considered, 1,208 were past LE raises questions about Defendants' version of events. (Ex. P, App. 145–155, Ex. Q at 214, App. 161).

### (iv) The jury may consider viatical life settlements

Defendants also argue that the jury should not be able to consider viatical settlements since their accuracy was skewed by advances in the treatment of HIV/ AIDS. (Dkt. 110 at 7). The Court rejects Defendants arguments that the viatical policies are irrelevant to the behavior in question in this case, and further rejects the notion that Life Partners' practices relating to viatical policies can be neatly separated from Life Partner's practices relating to senior life settlements. To evaluate whether Defendants behaved consciously in the manner that Plaintiff alleges, the jury needs to be able to evaluate Defendants extended track record with regard to LEs. Additionally, it is not at all clear from the record that Dr. Kelly's

work is wholly unrelated to the work performed by Dr. Cassidy. There is evidence in the record indicating that when Life Partners hired Cassidy, the company obtained LEs from Kelly based on the identical underwriting methodology. Indeed, Mr. Pardo testified that Cassidy worked under Kelly in preparing LEs for Life Partners before Kelly's death. (Pardo 7/9/13 Dep., 49, 1–21). Cassidy testified that Pardo "indicated that [Cassidy] would be able to tell from reading Dr. Kelly's letters, you know, what, how they were doing it. (Cassidy 5/18/2011 Dep., 265: 14–25). These facts, combined with LPHI's willingness to treat viatical and life settlements interchangeably when doing so suited their purposes, suffice to create a genuine issue of material fact.

### (v) The jury may evaluate whether Defendants possessed sufficient actuarial data to appropriately evaluate their life estimates and whether Defendants knew their LEs were incorrect when they made statements suggesting otherwise in a public filing.

■ Defendants' next argument relates to the always exciting field of statistics. Defendants posit that they lacked sufficient actuarial data to track the accuracy of their Life Estimates. The Court addressed this very argument when it rejected Defendants efforts to exclude expert testimony on this subject and the Court's thinking has not since changed. Defendants do not even come close to carrying their burden of demonstrating that there was not enough information from matured life settlement policies to provide statistically meaningful information about the accuracy of LPHI's LEs, and they certainly do not explain why, if that is in fact the case, they did not disclose this fact to their shareholders.

Along the same lines, there is more than enough evidence in the record suggesting that Defendants' knew that Life Partners systematically used underestimated LEs to broker life settlements when the company stated on its 10K that "LE's could be underestimated" to raise a jury question as to whether the Defendants violated a duty to the company's shareholders to speak the "full truth" regarding the reality and future consequences of their LE issues.

### (vi) Sufficient evidence exists to permit the jury to decide whether Peden and Pardo made actionable statements to shareholders.

 While his attorneys argue that Peden did not make actionable statements to shareholders, Peden signed all of Life Partners' annual filings in his capacity as Secretary and Director of LPHI. If those documents included materially false information, then Peden may be held liable as a signer. *See In re American Apparel, Inc. Shareholder Litigation.*, No. 10–cv–06352, 2013 WL 174119, at *25 (C.D.Cal. Jan. 16, 2013); *In re Smith Barney Transfer Agent Litig.*, 884 F.Supp.2d 152, 164–65 (S.D.N.Y.2012).

 The claims against Mr. Pardo are also sufficiently supported by evidence in the record to move forward to trial. Defendants contend that Mr. Pardo's statements in 2007 and 2008 about LPHI's larger than life ROI are not actionable since they were merely "statements of optimism" and were accurate when Pardo originally made them. While predictive statements are typically not actionable, "a defendant does not place itself beyond the reach of the securities laws merely by disclosing information that is predictive in nature ... whether liability is imposed depends on whether the predictive statement was false when it was made."

*Rubinstein v. Collins,* 20 F.3d 160, 166 (5th Cir.1994); *Isquith v. Middle South Utilities Inc.,* 847 F.2d 186, 204 (5th Cir. 1988). Here, there is evidence suggesting that Pardo intentionally refused to disclose to LPHI investors that he knew large numbers of active LEs were long. That being the case, there is a genuine question as to whether the CEO "spoke the full truth." *See Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 249 (5th Cir.2009) (holding that company officials engaged in fraud by omitting known risks to their business plan, although they recognized that signs of such dangers they privately predicted had already materialized). To the extent that Defendants argue that the SEC is presenting the evidence in a misleading light or are arguing that the evidence does not lead to the conclusion that the SEC claims it does, it is not this Court's place to evaluate these claims. That role belongs exclusively to the jury.

### (vii) Plaintiff's insider trading claim against Peden will be evaluated by the jury.

 Along with all of their other complaints, Defendants argue that insufficient evidence exists to permit Plaintiff's insider trading claim against Mr. Peden to go to a jury. The Court disagrees. In their motion, Defendants correctly observe that to establish that Peden is liable for Section 10(b) insider trading, Plaintiff must prove that he possessed "material, nonpublic information at the time of the trade, and that he intentionally used this material, nonpublic information in making this trade." *SEC v. Snyder,* No. H–03–04658, 2006 WL 1806164 at *9, 2006 U.S. Dist. LEXIS 45185 at *28 (S.D. Tex. June 29, 2006). Defendants are also correct that allegations of scienter relating to insider trading can be rebutted with evidence of non-culpable reasons for the

trade. *See. e.g., SEC v. Adler,* 137 F.3d 1325, 1340 (11th Cir.1998). Defendants, however, appear addled when it comes to applying these legal principles in the context of their request for summary judgment.

■ According to Defendants, Peden made the relevant sale "for personal, family reasons," most notably, to make a down payment on a new home and pay for his wedding. (Dkt. No. 110 at 24). Defendants appear to believe that these assertions eradicate any chance that a reasonable jury could conclude that Peden traded on inside information. Defendants nevertheless go on to confidently point out that even after Peden sold the stock that gave rise to the allegation, he still retained 81% of his LPHI stock and, additionally, that the closing price of LPHI stock in eight of the nine days following Peden's big sale was higher than the point at which he sold his stock. (*Id.*). These pieces of information will undoubtedly interest the jury, but they certainly are not dispositive. It is conceivable that Mr. Peden just happened to sell a sizeable portion of his holdings to satisfy liquidity needs (the new house and the wedding) right as LPHI's stock began to move in a big way, but the Court can just as easily see how a juror might view these liquidity needs as a possible motive for Mr. Peden to sell stock using inside information. As for Defendants' suggestion that the fact that Mr. Peden did not sell at the very peak of the market, this would hardly be remarkable in an insider trading case. Trading on inside information gives the culprit an illegal window into what direction a stock is likely to go. It does not, however, inform the culprit how far in that direction the stock will rise. Additionally, if the government's theory is right and Mr. Peden was indeed trading on inside information, it would stand to reason that a reasonably smart fellow like Mr.

Peden would want to sell at an opportune, but perhaps not *the most* opportune, time, if only to avoid more suspicion than his behavior was already bound to attract. In any event, these are all issues best left to the jury to decide in this case.

### (viii) The SEC's impairment claims will be evaluated by the jury.

Finally, the Court rejects Defendants' argument that the Court should dismiss the SEC's impairment claims on account of a lack of evidence that Defendants acted with a culpable mental state. Impairment refers to the process by which LPHI makes adjustments to the carrying value of a long-lived asset when events or changes in circumstances indicate that the carrying value may not be recoverable by the company. The long lived assets in this case are the settlements that LPHI owned itself and had on its own books. As explained earlier, there is evidence in the record which suggests that Defendants knew that the LEs on the policies LPHI brokered were systematically short, and that same evidence suffices to create a genuine issue of material fact as to the SEC's impairment claims. While the Court could go on to discuss all of the other evidence that raises a genuine issue of material fact relating to the allegations relating to the SEC's impairment claims, the Court need not address those issues since the aforementioned facts alone suffice to defeat Defendants' demand for summary judgment.

### IV. CONCLUSION

For the reasons set out above, the Court DENIES Defendants' Motion for Summary Judgment. (Dkt. No. 110).

### *ORDER*

Before the Court is Defendant's Motion to Reconsideration. (Dkt. No. 158). For

reasons briefly set out below, the Court denies Defendants' motion.

Defendants ask this Court to reconsider its previously issued ruling that life settlements facilitated by Life Partners Inc. ("LPI") are securities under federal securities laws. Defendants offer four separate reasons the Court should reverse course: (1) the D.C. Circuit opinion, which the Court declined to adopt, is actually binding on the Court under the doctrines of *res judicata* and collateral estoppel; (2) the Court's ruling constitutes an advisory opinion in contravention of Article III of the U.S. Constitution; (3) the Court's ruling that viatical settlements are securities is not essential to the Order; (4) the Court's ruling that viatical settlements are securities cannot be dismissed as mere harmless dicta because the ruling is virtually certain to have prejudicial impact on proceedings in other Courts.

▮▮▮ Reconsideration is appropriate only in extraordinary circumstances. *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir.2004). Specifically, motions for reconsideration "serve the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *Waltman v. Intl'l Paper Co.*, 875 F.2d 468, 473 (5th Cir.1989).

A. *Defendants waived their res judicata and collateral estoppel arguments by not raising them previously and, even if this were not the case, neither doctrine applies.*

▮▮▮ Defendants propose that the holding of the Court of Appeals for the District of Columbia Circuit in *S.E.C. v. Life Partners* is in fact binding upon this Court. Several facts doom Defendants arguments to failure. To begin with, Defendants waived their right to offer their *res judicata* or collateral estoppel arguments by not raising them before the Court issued its order. Anticipating the Court's skepticism and apparently not wanting to let facts get in the way of a good story, Defendants argue that their failure to timely raise these arguments was a product of the fact that they could never, in a million years, have imagined that the Court might reach the issue of whether viatical and life settlements are securities under federal law. The Court is unsympathetic. Throughout this case (in multiple filings relating to several different motions), Defendants have repeatedly argued that this Court lacks jurisdiction over some of the S.E.C.'s claims on the grounds that, as a matter of law, Life Partners' life settlement products are not securities. (*See* Dkt. No. 12 at 8; Dkt No. 14–1 at 2; Dkt. No. 16 at 2; Dkt. No. 110 at 3–4; Dkt. No. 144 at 2 n. 1). Each time Defendants made this argument, they relied upon the D.C. Circuit's *Life Partners* holding to support their assertion. (*Id.*). In light of these facts, the Court finds Defendants' complaint that they could never have anticipated that the Court would address the status of LPI's products under federal law to be absurd. If anything, the Court suspects that Defendants consciously decided not to argue either claim or issue preclusion (since neither argument is sound) and instead to simply cite the D.C. Circuit's *Life Partners* opinion in hopes that the Court would apply the Court's holding to the present matter. Whatever the reason, though, Defendants waived their claim and issue preclusion arguments by not raising them in conjunction with their argument that this Court lacks jurisdiction over certain claims since LPI's products are not securities as a matter of law.

In spite of the above analysis, Defendants should not despair that they did not raise their claim or issue preclusion arguments in conjunction with their citations to

the D.C. Circuit's holding in *Life Partners.* They did not waive a winning argument and, even if they were timely raised, nothing would have changed.

■ The doctrine of *res judicata* serves to proscribe the re-litigation of claims that have either been litigated or should have been raised in an earlier suit. *St. Paul Mercury Ins. Co. v. Williamson,* 224 F.3d 425, 436 (5th Cir.2000). To support a finding of *res judicata,* the parties must be identical or in privity, the prior action must have been rendered by a court of competent jurisdiction, the prior action must have been concluded by a final judgment on the merits, and the same claim or cause of action must have been involved in both actions. *Id.*

In this case, Defendants *res judicata* argument necessarily fails since this matter does not involve the same claims as those presented in the original D.C. Circuit matter. This case involves allegations that Defendants committed securities fraud against the shareholders of an entity that did not exist when the D.C. Circuit handed down its opinion in 1996. Furthermore, the parties are not in privity. The present matter involves a publicly traded company making representations to its shareholders while the 1996 case involved a private company selling viatical settlements to retail purchasers.

As for Defendants' contention that collateral estoppel bars the Court from rejecting their assertion that LPI's products are securities under federal law, the Court rejects Defendants' argument that there is no special circumstance that would make the use of issue preclusion unfair or inappropriate. Prior to this Court addressing the issue, neither the United States Court of Appeals for the Fifth Circuit nor any federal district Court within its jurisdiction had addressed the question of whether life settlements or viatical settlements are se-curities under federal law. Given that there is a circuit split between the D.C. Circuit and the 11th Circuit on this point, it would have be both nonsensical and irresponsible for the Court to blindly apply the holding of the D.C. Circuit without even considering the substance of the 11th Circuit's judgment on the same matter given that neither court's opinion is any more or less binding on this Court than the other's.

B. *Reconsideration is inappropriate since Defendants repeatedly argued that the Court did not have jurisdiction over certain claims since LPI's products are not securities as a matter of law.*

Next, Defendants offer four discrete reasons that the Court's holding that the life settlements facilitated by LPI are securities under federal securities law constitutes an impermissible advisory opinion. The crux of Defendants argument is that the Court did not have any reason to address whether or not the viatical settlements facilitated by LPI constitute securities under federal law. Defendants are wrong, and they of all people should know that this is the case since they themselves opened the door and invited the Court to address the classification question. In their Motion for Summary Judgment, Defendants argued that "because (1) LPI is not a Defendant in this case and (2) the life settlements are not 'securities' under federal securities law, the Court lacks jurisdiction over the manner in which LPI facilitates the sales of life settlements." (Dkt. No. 110 at 9). There is only one way to understand the meaning of Defendants' assertion: even if the Court rejected their complaints relating to LPI's status as a non-party, the Court nevertheless does not have jurisdiction over any of the SEC's allegations relating to behavior which pre-

dated LPHI's status as a public company and related solely to the manner in which LPI conducted its business. That this is what Defendants plainly did argue is underscored by Defendants firmly expressed conviction that "Plaintiff is prohibited from improperly attempting to bootstrap a non-securities case into a securities case." (*Id.*). Implicit in all of these arguments is a simple assertion: even if LPI and LPHI's distinction is not legally significant, large portions of the SEC's allegations are nevertheless barred since LPI's viatical and life settlement transactions are not securities under federal law and therefore are not actionable under federal securities laws. In light of these facts, the Court is highly unreceptive to Defendants' protestations. If Defendants did not want the Court to address the classification question, they should not have argued that the Court was obligated to dismiss many of the SEC's claims on the grounds that LPI's viatical and life settlement transactions are not securities under the federal securities law.

In sum, the "classification" question was very much before the Court. The Court responded to Defendants arguments. That they are not fond of the consequences of the Court's interpretation of the law is not a reason for the Court to entertain reconsidering its previously issued order in this case.

Accordingly, the Court DENIES Defendants' Motion for Reconsideration (Dkt. No. 158).